## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| INDIA BANKS, on Behalf of Herself and All Others Similarly Situated, | |
| Plaintiff, | **CIVIL ACTION NO.** |
| vs. | **CLASS ACTION COMPLAINT** |
| **KENNETH REES**; **THINK FINANCE, INC**.; **THINK FINANCE SPV, LLC; TC DECISION SCIENCES, LLC**; TC LOAN SERVICE, LLC; **TAILWIND MARKETING, LLC**; TC ADMINISTRATIVE SERVICES, LLC, and **GPL SERVICING, LTD.** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, India Banks ("Plaintiff"), *on behalf of all individuals similarly situated*, by counsel, and for her Class Action Complaint against Defendants, she alleges as follows:

### INTRODUCTION

1.      Like many other states, Florida enacted usury laws that prohibit lenders from making high interest loans. The prohibition against the making of unethical monetary loans is not a modern principle; indeed, "[f]or nearly three-hundred years, American states were nearly unanimous in their prohibition of usurious lending through double—or even single-

digit interest rate caps." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012). With roots as ancient as the Bible, usury laws reflect society's *longstanding* view that it is unethical and, thus, illegal to charge excessive interest rates—a view hammered home by a variety of jurisdictions who have criminalized this conduct. *See, e.g.*, Leah A. Plunkett & Ana Lucia Hurtado, *Small-Dollar Loans, Big Problems: How States Protect Consumers from Abuses and How the Federal Government Can Help*, 44 Suffolk U. L. Rev. 31, 36-37 (2011); *see also* Peterson, *supra*, at 896, 899; Robin A. Morris, *Consumer Debt and Usury: A New Rationale for Usury*, 15 Pepp. L. Rev. 151, 151 (1988) (explaining that usury laws are "society's oldest continuous form of commercial regulation").

2.      Pursuant to Fla. Stat. § 687.03, the maximum allowable rate of interest on loans of $500,000 or less is set forth as the greater of eighteen percent (18%). Like the many states that criminalize usury, the Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

3.      In an attempt to circumvent state and federal lending laws, Defendant Kenneth Rees approached members of the Otoe-Missouria Tribe (collectively the "Tribe") for the purpose of establishing separate "rent-a-tribe" enterprise. Beginning in 2011, Defendants established and controlled the operations of Great Plains, LLC ("Great Plains")—the tribal enterprise that served as a front to disguise the Defendants' roles and

to ostensibly shield the scheme from liability through a "rent-a-tribe" structure that attempted to exploit Indian Tribal Sovereign Immunity.[1] Pursuant to this scheme, Defendants made loans in Florida with annual percentage rates in excess of 400%—many orders of magnitude greater than the operative interest caps discussed above in Florida.

4.    Based on Defendants' conduct, Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants acted in concert and conspired with each other to repeatedly violate federal and state lending statutes resulting in the collection of an unlawful debt from Plaintiff and the class members. Defendants are "persons" as defined in 18 U.S.C. § 1961(3), and the usurious debts they sought to collect and did collect are "unlawful debts" under 18 U.S.C. § 1961(6). Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

5.    Plaintiff also seeks a declaratory judgment that the loan agreements related to Defendants' rent-a-tribe scheme are void and unenforceable.  The Supreme Court of Florida has held that loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature."  *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935). Additionally, pursuant to Fla. Stat. § 516.02, loans issued by unlicensed lenders and loans

---

[1] *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (explaining that "tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." (citing Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012))).

of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Defendants' loan agreements not only violate the statutory provisions on usury (both civil and criminal), but they also contain unconscionable choice of law and arbitration provisions that seek to disclaim all federal and state laws in favor of "tribal law." These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy. On two recent occasions, including a case involving the Great Plains' loan agreement at issue in this case, the Fourth Circuit held that similar provisions were unenforceable for violating public policy.[2]

6.      Plaintiff also asserts a class claim for violations of Florida's usury laws. Because the loans greatly exceed the annual percentage rates ("APR") discussed in paragraph 2, *supra*, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans.  Fla. Stat. § 516.02(1-2). Additionally, Plaintiff and the class members seek to disgorge twice the amount of all usurious interest paid by Florida consumers. Fla. Stat. § 687.04.

---

[2] *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to Plaintiffs' federal claims."); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 335-36 (4th Cir. 2017) ("We hold that the above provisions . . . are not distinguishable in substance from the related provisions . . .  we held unenforceable in *Hayes*. The arbitration agreement in this case implicitly accomplishes what the Western Sky Agreement explicated stated, namely, that the arbitrator shall allow for the application of any law other than tribal law. Just as we did in *Hayes*, we interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.") (emphasis in original).

## JURISDICTION

7.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff India Banks is a resident of this District and Division and a substantial part of Plaintiff's claims occurred in Florida.

## PARTIES

9.      Plaintiff India Banks ("Banks") is a natural person and resident of the Middle District of Florida and the Tampa Division.

10.     Defendant Kenneth Rees ("Rees") is a natural person and resident of the state of Texas. At all times relevant, Rees was the president and chief executive officer of Defendant Think Finance, Inc. ("Think Finance"). Rees is also the founder, chief executive officer, and sole registered member of Tailwind Marketing, LLC ("Tailwind Marketing") and TC Decisions, LLC ("TC Decisions").

11.     Think Finance is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001. Although the Tribes held themselves out as the actual lender of these internet loans, Think Finance ran the day-to-day operations of the lending enterprise. Additionally, Think Finance initially performed the application processing, underwriting, and customer service support for the loans, but some of these tasks were later delegated to the other companies identified herein. Upon information and belief, after several lawsuits were filed against Think Finance, Rees

conveyed all of the assets and responsibilities of Think Finance to Defendant Think Finance SPV, LLC ("Think Finance SPV"). Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

12.    Think Finance SPV is a limited liability company formed under the laws of Delaware with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. According for the Application for Registration submitted to Secretary of State of Texas, Think Finance SPV's stated business purpose is "managing, marketing, making, and servicing consumer credit products." This document was signed by Rees as president.

13.    Tailwind Marketing is a limited liability company with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. As explained below, Tailwind participated in the enterprise as the marketing and technology arm to disguise the involvement of Rees and Think Finance. According to the Application for Registration submitted to the Secretary of State of Texas in 2008, Tailwind Marketing's stated business purpose was to "provide marketing and consumer financial services." This Application for Registration was signed by Rees as "the President of TC Loan Service, LLC," the Sole Member of Tailwind Marketing.

14.    TC Loan Services, LLC ("TC Loan Services") is a limited liability with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. TC Loan Services participated in the enterprise as the controlling member of Tailwind Marketing. TC Loan Services was created to further insulate Defendants from

liability by adding an extra layer of corporate protection to the misconduct of Tailwind Marketing.

15.    Defendant TC Decision Sciences, LLC ("TC Decision Sciences"), is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. As explained below, TC Decision Sciences participated in the enterprise as the website operator and software administrator for the rent-a-tribe scheme. TC Decision Sciences also provided risk management, *i.e.*, it performed analysis to help predicate payment risk and developed the lending criteria to ensure the profitability of the rent-a-tribe scheme.

16.    Defendant TC Administrative Services, LLC ("TC Administrative"), is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. As explained below, TC Administrative participated in the enterprise as an administrative service provider and, more importantly, as the entity who received Think Finance's share of the profits of the scheme. Pursuant to the parties' agreements, TC Administrative Services received the "net income of GPLS" after accounting for the fixed return of 18-20% allocated to GPLS. It also bought back any losses on the loans.

17.    Defendant GPL Servicing, Ltd. ("GPLS") is a foreign corporation incorporated under the laws of the Cayman Islands. After the loans were originated, they were assigned within two days to GPLS for the purpose of servicing and collection. Upon information and belief, GPLS is owned by Rees, Think Finance and several other

individuals who incorporated the collection arm of the operation in the Cayman Islands in further attempts to avoid legal liability.

## FACTUAL BACKGROUND

**A.    Florida's Restrictions on High Interest Rate Lending**

18.    A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to borrowers to provide funds in anticipation of an upcoming paycheck.  Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.  Like many other states, Florida has enacted usury laws that prohibit companies from making high interest loans such as payday loans.

19.    Pursuant to Fla. Stat. § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious.  Moreover, loans at rates between 25% and 45% per annum constitute criminal usury punishable as a second degree misdemeanor, Fla. Stat. § 687.071(2), and loans at rates greater than 45% per annum constitute criminal usury punishable as a third degree felony.  Fla. Stat. § 687.071(3).  Those who violate the usury provisions must forfeit double the amount of interest paid.  Fla. Stat. § 687.04.

20.    Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable.  Fla. Stat. § 516.02(1-2).

21.     The Florida Attorney General has clarified that payday loans and similar loans are subject to Florida's usury laws.  Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**B.     Overview of Defendants' Enterprise**

22.     RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

23.     The Supreme Court has held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

24.     Defendants Rees, Think Finance, Think Finance SPV, TC Decision Sciences, TC Loan Service, Tailwind Marketing, and GPLS worked together for the common purpose of making and collecting the usurious loans through the enterprise of Great Plains.

25.     Rees established the plan and strategy to create each of these entities and established their role in the making, marketing, and collection of the high-interest loans under the disguise of Great Plains.[3]

26.     As chief executive officer of Think Finance and the sole member of several of the other affiliated entities, Rees intentionally directed and personally participated in the creation, management, and operations of the tribal lending enterprises.

---

[3] Most of the facts from this section are taken from the Amended Complaint filed by the Attorney General for the Commonwealth of Pennsylvania against Rees, Think Finance, Tailwind Marketing, and TC Decisions. *Commonwealth of Pennsylvania v. Think Finance, Inc.*, Case No. 2:14-cv-07139(JCJ) (E.D. Pa.) (Am. Compl., Dkt. No. 57); *see also* Ben Walsh, *Outlawed By The States, Payday Lenders Take Refuge on Reservations,* Huffington Post (June 29, 2015, updated Sept. 8, 2015), http://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html.

27.    Prior to rebranding itself in 2010, Think Finance was known as ThinkCash, Inc., and it operated as an online payday lending website rather than through a "brick and mortar" lending store. Rees was the chief executive officer of Think Cash.

28.    Prior to establishing the rent-a-tribe scheme, Defendants were participating in a "rent-a-bank" scheme.

29.    Under the rent-a-bank model, a payday lender who was prohibited from making loans in a particular state would evade a state's lending restrictions by partnering with a bank that would act as a conduit for the loan in exchange for a fee.

30.    Beginning in 2005, the Federal Deposit and Insurance Corporation began cracking down on rent-a-bank arrangements, and the rent-a-bank arrangements were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks.

31.    In response, Rees developed a solution—he decided to exploit Native American tribes as the new mechanism to continue the scheme. Ben Walsh, *supra* note 3, at 2 ("But by 2010, various federal regulators had all but shut down the [rent-a-bank] arrangement. Rees needed a new way to keep his business alive. The solution he found was relatively straightforward: He'd work with Native American tribes . . . .").

32.    Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

33.    Prior to establishing the Great Plains rent-a-tribe enterprise, Rees sent a letter to the Chippewa Cree Tribe proposing that they participate in the joint lending venture.

34.     According to one tribal leader, "Think Finance made it clear to the Chippewa Cree that if the Tribe didn't accept Think Finance's terms, the company would be perfectly happy to find another tribe that would." *Id*. at 3.

35.     Within two weeks of receiving Rees' letter, the Chippewa Cree Tribe agreed to participate in the lending scheme and formed Plain Green, LLC ("Plain Green"). *Id*.

36.     Under the scheme, loans are made in the name of Plain Green, but Defendants provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

37.     Pursuant to the initial contract between the various entities, Think Finance agreed "to license its software to the Tribe pursuant to a software license agreement acceptable to the parties" and to also "provide risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement."

38.      Once the loan agreement was executed by a consumer, Plain Green immediately assigned the promissory note to GPLS for nothing of value.

39.     As compensation for serving as the front to allow Defendants to attempt to evade state licensure and to exploit Indian Tribal Sovereign Immunity, GPLS paid the Tribe 4.5% of the cash revenue received on the loans, reimbursed all expenses, and advanced the Tribe $50,000. *Id*.

40.     Upon information and belief, the Tribes have no control over the income or expenses of Plain Green and Great Plains and have no entitlement to the profits of the

companies except for the nominal, 4.5% flat-fee paid pursuant to the Term Sheet. *See also* Ben Walsh, *supra* note 3, at 3 ("Although [Plain Green] is nominally owned by the Chippewa Cree, the tribe has little actual involvement in its operations and receives a tiny fraction of the revenue generated by the business.").

41.    Shortly after entering into the rent-a-tribe arrangement with the Chippewa Cree Tribe, Rees contacted the Otoe-Missouria Tribe in Oklahoma, who agreed to participate in the lending scheme and formed Great Plains.

42.    The Great Plains enterprise is virtually identical to the structure of Plain Green. (*See, e.g.*, Great Plains Lending, Flow of Funds Overview, attached as Ex. 1; Great Plains Lending Meeting, Jan. 12, 2011 Powerpoint, attached as Ex. 2).

43.    As reflected by the attached exhibits, although Great Plains held itself out as the actual lenders of these internet payday loans, Defendants marketed, funded, collected the loans, and controlled the day-to-day operations and major business decisions of Great Plains.

44.    Upon information and belief, the money loaned to Plaintiff was transferred from a bank account owned and operated or controlled by Defendants even though Great Plains concealed this information from consumers.

45.    Furthermore, Great Plains never accepted consumer payments after the loan agreement was executed.

46.    Rather, all payments went to GPLS—a Cayman company owned by Rees and others in order to avoid liability.

47.    Defendants also established Tailwind Marketing, who participated in the enterprise as the marketing and solicitation arm to disguise the involvement of the other Defendants.

48.    Pursuant to a Marketing Agreement executed amongst the affiliated entities described herein, Tailwind Marketing handled the online and other advertisements for Great Plains. Tailwind Marketing also handled the lead generation used to identify and solicit potential consumers.[4]

49.    Tailwind received $100 for every borrower provided to Great Plains. This amount was paid by GPLS to Tailwind, but it came from the nominal amount of the proceeds allocated to Great Plains. (Ex. 1 at ¶ 6; Ex. 2 at TF-VA000923)).

50.    Similarly, pursuant to a Servicing Agreement executed amongst the affiliated entities described herein, TC Decision Sciences participated in the enterprises as the website operator and software administrator for Great Plains.

51.    As part of this role, TC Decision Sciences also handled customer service responsibilities, such as communications with consumers under the guise of Great Plains.

52.    TC Decision Sciences received $55 for each loan funded, as well as $5 a month for each active account with Great Plains. (Ex. 2 at TF-VA000923).

---

[4] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf. Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

53.     TC Administrative participated in the enterprise as an administrative service provider and, more importantly, as the pass through entity who received Think Finance's share of the profits of the scheme. *Id.*

54.     Pursuant to the parties' agreements, TC Administrative Services received the "net income of GPLS" after accounting for the fixed return of 18-20% allocated to GPLS. It also bought back any losses on the loans. *Id.*

55.     Because of their roles in the Great Plains and other enterprises, the Attorney General for the Commonwealth of Pennsylvania brought an enforcement action against Rees and most of the entities named herein. *Commonwealth of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying Rees, Think Finance, and other defendants' motion to dismiss alleged violations of Pennsylvania and federal laws prohibiting usurious and illegal lending practices).

56.     Upon information and belief, after the Pennsylvania Attorney General filed the lawsuit against Defendants, Rees conveyed all of the assets and responsibilities of Think Finance to Think Finance SPV. Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

57.     The Pennsylvania Attorney General is not alone in its attention to this unlawful business model. For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

58.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D.N.Y. Feb. 9, 2016) (Dkt. 1 at ¶¶ 1–3).

59.     For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id.* at ¶¶ 23-24.

60.    Just like the Tucker defendants, Defendants' business relationship with the Native American tribes was nothing more than a failed attempt to shield their illegitimate businesses with the protection of tribal immunity.

61.    Most, if not all, activities performed in connection with the loans are performed by Defendants' employees and not on the reservations—often located in Georgia, Pennsylvania, and Texas. Ben Walsh, *supra* note 3, at 10.

## C.    Facts As to Plaintiff India Banks

62.    On or about July 7, 2014, Plaintiff Banks applied for and received a payday loan in the amount of $1,000 from Great Plains by completing an application on the www.greatplainslending.com website.

63.    On 23 occasions between July 24, 2014, and May 28, 2015, Great Plains initiated debit transactions from Plaintiff Banks' checking account in Florida in the amount of $143.34.  On June 11, 2015, Great Plains initiated a debit transaction from Plaintiff Banks' checking account in Florida in the amount of $142.63.  As a result, Plaintiff Banks paid $3,439.45 in a period of less than 12 months to satisfy a $1,000 loan.  Thus, the annual percentage rate on the loan was nearly 350%.

64.    On or about September 1, 2015, Plaintiff Banks applied for and received a payday loan in the amount of $700 from Great Palins by completing an application on the www.greatplainslending.com website.

65.    On 11 occasions between September 18, 2015, and February 5, 2016, Great Plains initiated debit transactions from Plaintiff Banks' checking account in Florida in the amount of $118.43.  As a result, Plaintiff Banks paid $1,302.73 on a $700 loan in a period of less than five months.  The annual percentage rate charged by the bank on the loan was nearly 400%.[5]

### D.    Defendants' Loans Charged Interest in Violation of Florida's Usury Laws

66.    Defendants, together with other members of the Enterprise and individuals not yet known to Plaintiff, marketed, initiated, and collected usurious loans in Florida.

67.    In order to qualify for Defendants' loan product, consumers were required to electronically sign form contracts authored by Great Plains entitled "Consumer Loan Agreement" or "Consumer Installment Loan Agreement."

68.    Fla. Stat. §§ 687.03 and 516.02 prohibit any person or company from making such loans to Floridians in excess of eighteen percent (18%).  Fla. Stat. § 687.071 makes it a criminal offense to make usurious loans at rates of 25% of higher a criminal offense.

69.    Under Fla. Stat. § 516.02(c), loans made at rates in excess of 18% are unenforceable.  Moreover, loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature."  *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

---

[5] Based on the payments Ms. Banks made on the loan over a five-month period, paid an interest rate of at least over 200%.

70.     Accordingly, Defendants' loans were null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiff.

71.     Additionally, Plaintiff and the class members are entitled to disgorge plus twice the amount of usurious interest that was paid. Fla. Stat. § 687.04.

**E.     Defendants' Loans Collected Interest in Violation of RICO**

72.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

73.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

74.     Defendants charged an interest rate far in excess of the enforceable rate established by Fla. Stat.  §§ 687.03, 687.071, and 516.02, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

75.     As a result of Defendants' participation in the Enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**F.     The Loan Agreements Are Void and Unenforceable.**

76.     Because the loans charged and collected at interests rates far in excess of the enforceable rate established by Fla. Stat. §§ 687.071 and 516.02, the agreements were void under Florida law. Fla. Stat. § 516.02(c). ("A loan for which a greater rate of interest or

charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state"); *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature").

77.     Accordingly, Plaintiff seeks a declaratory judgment that Plaintiff and the class members' loans are void and that they no longer owe any amounts under their loans.

78.     Defendants' loan agreements not only violate Florida's public policy against usurious loans, but they also contain unconscionable choice of law and arbitration provisions that seek to disclaim all federal and state laws in favor of tribal law.

79.     In particular, Plaintiff's Great Plains' Loan Agreements contain provisions such as:

> **Version A**: **THIS AGREEMENT TO ARBITRATE SHALL BE GOVERNED BY TRIBAL LAW.** The arbitrator shall apply Tribal Law and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. The arbitrator shall make written findings and the arbitrator's award may be filed with a Tribal court.  The arbitration award shall be supported by substantial evidence and must be consistent with this Agreement and Tribal Law, and if it is not, it may be set aside by a Tribal court upon judicial review. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled. The parties will have the right to judicial review in a Tribal court of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the conclusions of law are erroneous under Tribal Law. Judgment confirming an award in such a proceeding may be entered only if a Tribal court determines that the award is supported by substantial evidence and is not based on legal error under Tribal Law.

**Version B**: THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE OTOE-MISSOURIA TRIBE OF INDIANS. The arbitrator will apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement, including the Agreement to Arbitrate. The arbitrator must apply the terms of this Agreement to Arbitrate, including without limitation the waiver of class-wide arbitration. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses. The arbitrator will make written findings and the arbitrator's award may be filed with the tribal court. The arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the tribal court upon judicial review.

80.     Just like the defendants in *Hayes*, Rees and his affiliated entities attempted to avoid federal and state laws through the use of unconscionable and unenforceable choice-of-law, forum selection, and arbitration provisions.

81.     In finding a nearly identical provisions unenforceable in *Hayes*, the Fourth Circuit explained, "We recognize that the FAA establishes a 'liberal policy favoring arbitration agreements.' But rather than use arbitration as a just and efficient means of dispute resolution, [the defendant] seeks to deploy it to avoid state and federal law and to game the entire system." *Hayes*, 811 F.3d at 676 (internal citations omitted).

82.     Over a year later, the Fourth Circuit reaffirmed the *Hayes* decision in a case involving a Great Plains Loan Agreement. *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 335-36 (4th Cir. 2017).

83.     In doing so, the Fourth Circuit held that Great Plains' choice of law and arbitration provisions were "not distinguishable in substance from the related provisions"

in *Hayes*, and it found that the agreement was "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." *Id.* (emphasis in original). Accordingly, the Fourth Circuit held "that the arbitration agreement between Dillon and Great Plains [was] unenforceable . . . ." *Id.* at 332. [6]

84.    Accordingly, Plaintiff requests the Court to enter a declaratory judgment that the governing law, forum selection, and arbitration provisions are unenforceable as to Florida consumers.

85.    Plaintiff further requests the Court to enter an injunction prohibiting Defendants from collecting any amounts from Florida consumers in connection with the loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and deleting any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## G.    Involvement and Personal Liability of Defendant Rees.

86.    During the pertinent times, Rees was the architect of the lending scheme, participated in the day-to-day operations of the scheme, and controlled the businesses.

87.    Rees formed and used these companies, including Think Finance, Tailwind Marketing, GPLS, TC Loan Service, and TC Decisions, to engage in unfair, deceptive, and abusive acts that harmed Plaintiff and the class members.

---

[6] The plaintiff in *Dillon* was a North Carolina consumer who commenced a case against BMO Harris and several other financial institutions who facilitated the "collection of unlawful debts" through the electronic transfer of funds between financial institutions. *Id.* Dillon did not seek any relief against Rees, Think Finance, Think Finance SPV, Tailwind Marketing, TC Decisions, or GPLS.

88.     Rees developed the strategy and role for each of the entities and the plan to perpetrate a nationwide scheme to collect full payment on small-dollar loans that state licensing and usury laws rendered wholly or partially void or uncollectible, including in Florida.

89.     Rees directly and actively managed the activities of Think Finance, Think Finance SPV, Tailwind Marketing, GPLS, TC Loan Service, and TC Decisions.

90.     Rees participated in and knew of the actions of Think Finance in Florida, which are the subject of this lawsuit. Rees chose Florida as a place where loans and collection efforts would ensue.

91.     Rees, during the pertinent times, was directly and materially involved in this intentional misconduct and knew the subject loan and debt collection scheme was illegal under Florida law, but he pursued the scheme anyway via his companies.

92.     Upon information and belief, after the Pennsylvania Attorney General filed the lawsuit against Defendants, Rees conveyed all of the assets and responsibilities of Think Finance to Think Finance SPV. Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

93.     Accordingly, Rees is jointly and severally liable for the claims herein by: (1) virtue of his direct personal involvement in the underlying fraudulent conduct and (2) as a result of the fraudulent transfer of Think Finance's assets.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

94.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

95.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for themselves and on behalf of a class—the "Florida RICO Class"—initially defined as:

> All Florida residents who executed a loan with Great Plains where the loan was originated and/or any payment was made on or after September 20, 2013.

> Plaintiff is a member of the Florida RICO Class.

96.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

97.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Great Plains constitutes an "enterprise" under RICO; (2) whether Rees, Think Finance, Think Finance SPV, TC

Decision Sciences, TC Loan Service, Tailwind Marketing, and GPLS participated in the enterprise; (3) whether the loans violated Fla. Stat. §§ 687.03, 687.071, and 516.02 because the interest rates were too high; and (4) what is the proper recovery for Plaintiff and the class members against each defendant.

98.    **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members.

99.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiff has have retained counsel competent and experienced in such litigation, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

100.    **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary

burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

101. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiff and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

102. As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

103. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

104.    All of the loans made to Florida residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Florida.

105.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Florida consumers.

106.    Plaintiff and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

107.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

108.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for themselves and on behalf of a class, initially defined as:

> All Florida residents who executed a loan with Great Plains where the loan was originated and/or any payment was made on or after September 20, 2013.

109.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

110.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class,

and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

111. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members.

112. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiff has have retained counsel competent and experienced in such litigation, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

113. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiff and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

114. As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate

§ 1962(c), including the Term Sheet between the Chippewa Cree Tribe, Think Finance, GPLS and the contracts related to the services performed by Tailwind Marketing and TC Decision Sciences as part of their roles in the enterprise.

115.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF FLORIDA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

116.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

117.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for themselves and on behalf of a class initially defined as follows:

**Florida Usury Class**: All Florida residents who executed a loan with Great Plains where any amount of principal, interest, or other fees were paid.

**Florida Usury Subclass**: All Florida residents who executed a loan with Great Plains where any interest was paid on or after September 20, 2015.

118.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

119.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiff believes that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Florida borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit.

120.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans violated Fla. Stat. §§ 687.03, 687.071, and 516.02 because the interest rates were too high and (2) what is the proper recovery for Plaintiff and the class members against each defendant.

121.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members.

122.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiff has have retained counsel competent and experienced in such litigation, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

123.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

124.    All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

125.    Accordingly, Plaintiff and the class members are entitled to disgorge twice the amount of such usurious interest that was paid.  Fla. Stat. § 687.04.

**COUNT FOUR:**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM)**

126.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

127.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class and subclass initially defined as follows:

**Declaratory Judgment Class**: All persons who: (1) executed a loan with Great Plains (2) when they resided or were located in Florida, (3) which contained an interest rate greater than eighteen percent (18%).

**Declaratory Judgment Subclass**: All persons who: (1) executed a loan with Great Plains (2) when they resided or were located in Florida, (3) which contained a choice-of-law provision, arbitration provision, or forum selection clause similar or identical to Plaintiff's.

Plaintiff is a member of the Declaratory Judgment Class and Subclass.

128.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

129.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void under Fla. Stat. §§ 687.03, 687.071, and 516.02 and (2) whether the loan agreements are void as a matter of public policy.

130.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes

of action as the other members of the putative class. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members.

131.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiff has have retained counsel competent and experienced in such litigation, and she intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests that might cause them to not vigorously pursue this action.

132.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

133.    Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state." Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than eighteen percent (18%).

134.    Moreover, Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty-five percent (25%). Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

135.    Thus, Plaintiff seeks a declaratory judgment that the loan agreements are void and unenforceable.

136.    Defendants' loan agreements not only violate the Florida usury statutes, but they also contain unconscionable choice of law, forum-selection, and arbitration provisions that are void and unenforceable for public policy concerns.

137.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law, forum-selection, and arbitration provisions

138.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

139.     Accordingly, Plaintiff, on behalf of herself and all others similarly situated, respectfully moves for entry of a declaratory judgment that the loan agreements are void and unenforceable. In the alternative, Plaintiff seeks a declaratory judgment that the choice of law, forum-selection, and arbitration provisions are void and unenforceable as a matter of public policy.

**COUNT FIVE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

140.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

141.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Florida Unjust Enrichment Class**: All Florida residents who executed a loan with Great Plains where any amount of principal, interest, fees, or other charges were repaid.

142.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

143.     Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this

Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG,

Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included

$9.43 million in compensation and forgiving $5 million in outstanding debt )

https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf;

Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus

Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-

releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online

($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and

$500,00 attorney's fees and costs).

144.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P.

23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there

are no factual or legal issues that differ between the putative class members. These questions

predominate over the questions affecting only individual class members. The principal issues

include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2)

whether Defendant knew or should have known of the benefit; (3) whether Defendants retained an

unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the

class members against each of the Defendants.

145.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of

each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative class. All claims are based on the same facts and legal

theories.

146.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate

representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

147.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

148.    All of the loans made by Defendants to Virginia consumers were void and unenforceable.

149.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

150.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans affliated with Defendants' scheme.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff requests that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory, injunctive and damages relief as pled herein;

C.    Attorney's fees, litigation expenses and costs of suit; and

D.    Such other or further relief as the Court deems proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in the instant action.

Dated: September 20, 2017                    Respectfully submitted,


                                     /s/ Manuel S. Hiraldo
                                    Manuel S. Hiraldo (FL Bar. No. 030380)
                                    Hiraldo P.A.
                                    401 E. Las Olas Boulevard, Suite 1400
                                    Fort Lauderdale, FL 33301
                                    Telephone: (954) 400-4713
                                    *mhiraldo@hiraldolaw.com*


                                    Jeffrey Kaliel (*pro hac vice* to be filed)
                                    Andrew Silver (*pro hac vice* to be filed)
                                    Tycko & Zavareei, LLP
                                    1828 L Street, N.W., Suite 1000
                                    Washington, D.C. 20036
                                    Telephone: (202) 973-0900
                                    Facsimile: (202) 973-0950
                                    *asilver@tzlegal.com*
                                    *jkaliel@tzlegal.com*

Kristi C. Kelly (*pro hac vice* to be filed)
Andrew J. Guzzo (*pro hac vice* to be filed)
Kelly & Crandall, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
*kkelly@kellyandcrandall.com*
*aguzzo@kellyandcrandall.com*

**Counsel for Plaintiff and the Proposed Class**